646 F.2d 101
 59 A.L.R.Fed. 918
 Irmtrud and Eric MILLER
v.
APARTMENTS AND HOMES OF NEW JERSEY, INC.; Peter Ronay; CIB
International, Inc.; Anthony Lacetola and James
Nuckel, CIB International, Inc., Anthony
Lacetola and James Nuckel, Appellants.
 No. 80-2260.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 12, 1981.
Decided April 22, 1981.
 
 1
 Jane W. Vanneman (argued), National Committee Against Discrimination in Housing, Washington, D. C., James Sacher, Middlesex County Legal Services Corp., New Brunswick, N. J., Andre Shramenko, Hackensack, N. J., for appellees.
 
 
 2
 Richard E. Snyder (argued), John D. Horan, Goodman, Stoldt & Horan, Hackensack, N. J., for appellants CIB International Inc., Anthony Lacetola and James Nuckel.
 
 
 3
 Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and TEITELBAUM, District Judge*.
 
 OPINION OF THE COURT
 
 4
 TEITELBAUM, District Judge.
 
 
 5
 The matter sub judice is an appeal from the decision of the District Court of New Jersey finding illegal racial discrimination in housing and awarding relief. The trial court, in the non-jury proceeding below, determined that the plaintiffs-appellees had impermissibly been denied the enjoyment of certain rental housing because of their race and awarded compensatory and punitive damages as well as attorney's fees. The defendants-appellants do not challenge the finding of liability, but rather have urged that the award was too high a price to pay for discriminating. A careful review of appellants' claims convinces us that the trial court committed no error. We affirm the judgment for the reasons set forth below.
 
 I.
 
 6
 In August of 1973, Irmtrud Miller, a white woman, visited the offices of Apartment and Homes of New Jersey, Inc. (hereinafter Apartments and Homes), the rental agent for apartments owned by James Nuckel and/or CIB International, Inc., (hereinafter CIB) a corporation owned by Mr. Nuckel. There Mrs. Miller met Peter Ronay, a broker employed by Apartments and Homes. They went to the Florence Apartments in Little Ferry, New Jersey. The resident superintendent gave Mr. Ronay a key for a vacant apartment, apartment sixty-seven. Mr. Ronay told Mrs. Miller the apartment was available. Mrs. Miller agreed to rent the apartment for herself and her husband, left a deposit for the apartment, and completed an application to rent the premises. She was advised that pending the results of a credit check, she could occupy the premises beginning on September 10, 1973.
 
 
 7
 On September 5, 1973, the Millers met Mr. Ronay to sign the lease. When Mr. Ronay saw that Mr. Miller was black, "there was a perceptible change in (his) attitude," according to the findings of the district court. The court did not specify what change occurred. In any event, Mr. Ronay and the Millers executed a formal lease for apartment sixty-seven. Mr. Ronay told the Millers that the key would be available at the office of the resident superintendent on September 7, 1973. Mr. Miller went to the resident superintendent's office on the evening of September 7 and asked for the key to his apartment. He did not state which apartment he had rented, and the superintendent did not ask. Instead, the superintendent stated that he had no knowledge of Mr. Miller's rental of any apartment and asked him to wait outside while he checked further. After waiting about fifteen minutes Mr. Miller again knocked at the door and was told to wait. After another half hour, the superintendent advised Mr. Miller that he had no knowledge of the rental. Mr. Miller asked if he could look at the apartment, but again he did not specify the apartment number. The superintendent reiterated that he had no knowledge of Mr. Miller's lease, but he took Mr. Miller directly to apartment sixty-seven without ever asking Mr. Miller which apartment he had rented. Mr. Miller specifically requested the keys to apartment sixty-seven and was refused. Mr. Miller described the superintendent's attitude throughout the encounter as "cold" and testified that the superintendent looked "through" him and not at him. He testified also that he felt humiliated and downgraded, like a "village idiot," by being made to wait outside the superintendent's office for approximately forty-five minutes. The next day the Millers went to the rental offices of CIB. Mr. Lacetola, in charge of the CIB office falsely told the Millers that the apartment had been previously rented.[1] He suggested that they see Mr. Ronay about another apartment.
 
 
 8
 The Millers returned to Apartments and Homes to find alternative accommodations. Mr. Ronay was sympathetic to their plight, and made some modest, but unsuccessful effort to find another apartment for them. Upon reflection the Millers decided they were entitled to apartment sixty-seven and telephoned Mr. Lacetola to inform him of their position. He agreed that they were entitled to the apartment and indicated that he would have the key on September 10, 1973. On that day, having arranged to vacate their prior residence, the Millers, with all their possessions in a moving van, arrived at the CIB rental office to obtain the key as prearranged. Mrs. Miller's request for the key was refused, again ostensibly because the apartment had been previously rented. Mr. Lacetola, although he had access to an extensive list of vacant apartments owned by Mr. Nuckel and/or CIB, remained indifferent to the Miller's plight. After a brief stay with relatives, the Millers by their own efforts were fortunate enough to lease a different apartment. By coincidence it was owned and operated by the appellants, Nuckel and CIB, but the Millers did not deal with Mr. Ronay or the CIB rental office in learning of it. Unfortunately this substitute apartment was at a higher rental, and required the Millers to expend greater sums than they would have paid in apartment sixty-seven for equivalent necessary utility services.
 
 
 9
 On October 30, 1973, the Millers instituted this action against Apartments and Homes, Mr. Ronay, CIB, Mr. Lacetola and Mr. Nuckel.[2] Near the end of 1975, the plaintiffs agreed to settle their claim against Apartments and Homes and Mr. Ronay for $1,821.00. The action against the remaining defendants proceeded to trial before the court, sitting without a jury. In addition to determining the aforementioned facts, the district court also noted that Mr. Nuckel and CIB had been the subjects of remedial court orders to cease discrimination. Despite those orders, statements made by Mr. Nuckel at his deposition (introduced into evidence at trial) showed his utter disregard for his obligations to promulgate and implement a policy of non-discrimination. The court found Mr. Nuckel was interested only in building and money, and not in people; people who contributed to Mr. Nuckel's and/or CIB's monthly gross rental income of $400,000.00. The court also found that Mr. Nuckel and CIB disobeyed the prior remedial order by failing to instruct employees not to discriminate on the basis of race, and by falsifying required records showing the number of minority tenants.
 
 
 10
 In addition to these findings, the district court was also obliged to determine the appropriate amount of damages. The damages disputed in this appeal represent a portion of the compensatory damages, specifically, the sum awarded as the difference in rent and utility payments between what the Millers were required to pay and the amount that would have been required for apartment sixty-seven, an amount of $4,451.00; and the award of punitive damages of $25,000 assessed against Mr. Nuckel and CIB.[3] Additionally, the court below held that the defendants were entitled to only a pro tanto reduction for the amounts previously paid by Mr. Ronay and Apartments and Homes in the settlement. Finally, an award of $21,845.00 was made for attorneys' fees.
 
 II.
 
 11
 As we previously noted, this is not an appeal alleging an error in the finding of liability, but rather a plea that the size of the total award was too great. While the trial court committed no error, several interesting issues have been raised which demand this Court's attention. We turn now to those issues.
 
 A.
 
 12
 The appellants claim that the district court erred on its ruling on the effect of a settlement upon the liability of the remaining defendants. The district court held that the award of compensatory damages against the appellants should be reduced by $1,821.00, the amount of appellees' settlement with defendants Mr. Ronay and Apartments and Homes. The appellants argue that instead of this pro tanto reduction for the settlement, the court should have granted them a pro rata reduction of liability.[4] They maintain that since there were essentially two groups of defendants in the case Apartments and Homes and its employees, and Mr. Nuckel, his employees and subordinates that the settlement with one group extinguished half of the Millers' claim.[5]
 
 
 13
 This the Millers deny. They insist that federal common law should govern with respect to the effect of settlements upon the liability of joint violators of federal civil rights statutes. They further insist that the federal rule relating to settlements should be the rule of pro tanto rather than pro rata reduction.
 
 
 14
 This case therefore appears to require the Court to decide whether state or federal law applies to such questions under the civil rights statutes, and what the pertinent rule should be. The general problem of whether state law or federal common law should apply to various subordinate issues relating to federal statutory rights is a familiar one. It derives from what Professor Hart called the "interstitial character" of federal law. The general problem extends to questions such as statutes of limitation and tolling rules, mental capacity, right to jury trial of designated issues, defenses in commercial paper law, and implied rights of action under federal statutes as well as to contribution rules. Professor Wright has said:
 
 
 15
 Whether state law or federal law controls on matters not covered by the Constitution or an Act of Congress is a very complicated question which yields to no simple answer in terms of the parties to the suit, the basis of jurisdiction, or the source of the right which is to be enforced.
 
 
 16
 C. Wright, Handbook of the Law of Federal Courts 247 (2d ed. 1970). The question is examined in all its complexity by Professor Wright, id. at 247-53, and by Professor Wechsler and his colleagues in Hart and Wechsler's The Federal Courts and the Federal System at 756-832 (2d ed. 1973) (Bator, Mishkin, Shapiro and Wechsler, eds.).
 
 
 17
 Happily, the present case may be decided without a comprehensive reevaluation of the entire thicket. Congress provided the courts some modest guidance for resolving the choice of law question in civil rights cases in 42 U.S.C. § 1988. That section provides, in pertinent part:
 
 
 18
 § 1988. Proceedings in vindication of civil rights.
 
 
 19
 The jurisdiction in civil matters conferred on the district courts by the provisions of this chapter for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause
 
 
 20
 This section invites federal courts to adopt state rules to further, but not to frustrate, the purposes of the civil rights acts. Its general language invites courts to use their judgment in resolving problems. The cases are not in perfect harmony. This neither troubles nor surprises us. There is, however, a fair uniformity in favor of allowing contribution among the few courts which have considered the general question of contribution under the civil rights acts. See Glus v. G. C. Murphy Co., 629 F.2d 248 (3rd Cir. 1980), petition for cert. filed sub nom. Retail, Wholesale and Department Store Union v. G. C. Murphy Co., -- U.S. --, 101 S.Ct. 351, 66 L.Ed.2d 212 (1980) (contribution allowed where payment by one defendant to the plaintiff settled entire claim); Denicola v. G. C. Murphy Co., 562 F.2d 889 (3rd Cir. 1977); Johnson v. Rogers, 621 F.2d 300 (8th Cir. 1980) (applying state law under section 1988); cf. Grogg v. General Motors Corp., 72 F.R.D. 523 (S.D.N.Y.1976); I. U. of E. Radio and Machine Workers v. Westinghouse Electric Corp., 73 F.R.D. 57 (W.D.N.Y.1976); Blanton v. Southern Bell Tel. & Tel. Co., 49 F.R.D. 162 (N.D.Ga.1970).
 
 
 21
 When narrower questions are asked, the decisions tend to disagree. In Johnson v. Rogers, supra, a former deputy sheriff sued the sheriff and the county under 42 U.S.C. § 1983. The plaintiff settled her claim against the county for $7500.00. By the settlement agreement, she agreed "to credit and satisfy only 'that portion of the total amount of her damages which may hereafter be allocated in the trial or otherwise to causal (sic) acts or admissions (sic) on the part of the Defendant County of Meeker.' " At the trial no damages were assessed against or allocated to the county. The trial court rendered a judgment against the sheriff for $7500.00. The sheriff sought complete exoneration, arguing that the plaintiff's proved damages had been fully satisfied by the settlement. The Court of Appeals for the Eighth Circuit rejected that claim. It held, initially, that the effect of the settlement was governed by Minnesota law under section 1988.
 
 
 22
 Since this is a civil rights action brought under 42 U.S.C. § 1983, § 1988 determines choice of law. As construed by the Supreme Court in Robertson v. Wegmann, 436 U.S. 584, 588-90, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978), § 1988 instructs that if federal law does not cover an issue, then state law should provide the rule of decision unless "inconsistent with the Constitution and laws of the United States." In the instant case, as federal law does not answer the question of the effect of a plaintiff's settlement with one defendant on an award of damages against a non-settling defendant, state law should serve as the federal rule of decision unless inconsistent with the policies underlying a § 1983 cause of action. Among the principal objectives of § 1983 are "compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." Robertson v. Wegmann, supra, 436 U.S. at 590-91, 98 S.Ct. at 1995. Neither of these concerns would seem to be hindered by adoption of the Minnesota Court's approach.
 
 
 23
 Id. at 304. This led the court to examine the Minnesota law. The court concluded that a non-settling defendant is entitled to have the amount of a settlement credited against the plaintiff's damages only if it appears at trial that the settling defendant would have been liable to the plaintiff. Since that fact was not proved at trial, the sheriff was denied any benefit based on the settlement.
 
 
 24
 A month after the decision of Johnson v. Rogers, supra, this Court decided Glus v. G. C. Murphy Co., supra. In Glus, female employees of the G. C. Murphy Co. brought a class action under Title VII of the Civil Rights Act of 1964. They sought damages for employment discrimination on the basis of sex. Murphy filed cross-claims against certain unions seeking contribution. Prior to trial, Murphy and the plaintiff class settled the class action. Litigation continued on the cross-claims. The district court held that both Murphy and the unions had violated Title VII, and that Murphy was entitled to contribution with respect to the Title VII settlement.
 
 
 25
 This Court affirmed that decision, and held that Murphy was entitled to contribution as a matter of federal common law. We noted that Title VII does not specifically deal with the problem of contribution. The problem is interstitial. Whether this particular interstice was to be filled with federal common law or with state law depended upon an extensive analysis of Congressional purpose; of the underlying goals of a statute; of the extent to which the application of federal law would further those goals or the application of state laws would impede them; and of the traditional allocation of functions between state and federal law. Applying that analysis, we found no specific Congressional intent as to contribution; that Congress did intend to make unions liable for discrimination under Title VII; that a rule of contribution would further the purpose of Title VII by inducing employers and unions to be vigilant in observing Title VII requirements and in encouraging conciliation which Title VII favors.
 
 
 26
 Nothing in this case suggests that a different analysis or a different result should follow in civil rights cases. Neither does Johnson v. Rogers, supra, which was not considered in Glus, convince us that state law, rather than federal law, should apply. Johnson's discussion of the choice of law problem relied on the text of section 1988 and on the Supreme Court's decision in Robertson v. Wegmann, supra. We disagree with the Eighth Circuit's reading of those authorities. Section 1988 declares that the civil rights acts shall be "enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies the common law, as modified and changed by the Constitution and statutes of the State shall be extended to and govern the trial and disposition of the cause " The Eighth Circuit in Johnson held that federal law does not prescribe a rule of contribution in civil rights cases, so state law must apply.
 
 
 27
 Robertson v. Wegmann, supra, does not require this analysis of the problem. In Robertson, the Supreme Court decided that state law governs some issues of survival of section 1983 causes of action. The decision that federal law is "deficient" with respect to survival was brief and conclusory. In essence the Supreme Court reasoned that the federal law "does not cover every issue that may arise in the context of a federal civil rights action " id. 436 U.S. at 588, 98 S.Ct. at 1994. The Court then declared that "one specific area not covered by federal law is that relating to 'the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant ' State statutes governing the survival of state actions do exist, however (They provide) the principal reference point in determining survival of civil rights actions " id. at 589-90, 98 S.Ct. at 1994-1995.
 
 
 28
 We do not understand that decision to abandon the historic method of analysis of problems of claimed federal common law rights. One traditional ground for refusing to declare federal common law to fill particular interstices of statutory law is this: that the question to be answered is one particularly suited to statutory rather than to judicial solution. Thus federal courts habitually apply state statutes of limitations to federal causes of action where Congress has not adopted an applicable limitation. Another traditional ground for refusing to declare federal common law is that the question to be answered lies in an area which is traditionally of state rather than federal concern. Matters of domestic relations including domestic property allocations such as the division of property upon divorce, and rules of descent, distribution and wills clearly are within this area of traditional state concern. We understand the decision in Robertson to rest on both of these grounds. The Court specifically referred to the existence and diversity of state survival statutes and to the fact that the states generally used statutes (rather than judicial declaration) to abrogate the ancient common law rule against the survival of actions, id. at 589, 98 S.Ct. at 1994. The Court also noted the diversity of state statutes with respect to the kinds of claims which survive and with respect to the identity of the successors, id. at 591. Finally, the Court noted the absence of general federal provisions concerning survival of actions, id. at 589, 98 S.Ct. at 1994.
 
 
 29
 The present problem is unlike the problem in Robertson in three important ways. First, the rule of contribution is intimately bound up with the nature and extent of the substantive federal rights created by the civil rights acts. Questions of limitation periods and of survival are less related to the substance of the federal rights. See, Dice v. Akron, C. & Y. R. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952). Contribution rules declare which defendants are liable and how much they owe. Contribution rules are of high importance in the process of settling claims before trial. Consequently, the selection of a contribution rule bears on the work of the federal courts as well as on the substantive rights and liabilities of the parties.
 
 
 30
 Second, contribution rules are not traditional matters of state rather than federal concern. Federal courts have fashioned common law contribution principles in civil rights cases, Glus, supra, and in anti-trust cases, Wilson P. Abraham Constr. Corp. v. Texas Industries, Inc., 604 F.2d 897 (5th Cir. 1979), cert. granted sub nom. Texas Industries, Inc. v. Radcliff Materials, Inc., -- U.S. --, 101 S.Ct. 351, 66 L.Ed.2d 213 (1980) (contribution is a matter of federal law). Federal contribution rules have long governed collision cases in admiralty, Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), and govern the availability of contribution in admiralty actions for personal injury not based on collisions, id., Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974).
 
 
 31
 Finally, contribution rules, unlike limitations and survival rules, are not invariably legislative creations. Federal courts have fashioned contribution rules in various fields. Some state courts have overruled the ancient rule against contribution without waiting for the adoption of a contribution statute. W. Prosser, Handbook of the Law of Torts § 50 at 306-07 (4th ed. 1971). Thus no special considerations of institutional competence prevent the courts from elaborating a federal common law of contribution in civil rights cases.
 
 
 32
 Our decision that federal law determines the availability of contribution in federal civil rights suits requires us to determine what that rule is where one of two defendants settles with a plaintiff before a trial. The non-settling defendants claim that they should receive a pro rata reduction of the damages award because the plaintiff has deprived the defendant of recourse against the settling defendant. This, the defendant urges, would be the result under the "enlightened" New Jersey rule. The plaintiff replies that the district court correctly applied a rule of pro tanto reduction.
 
 
 33
 Our decision in the Glus case, supra, does not resolve this problem. There the only defendant settled the plaintiff's entire claim. The defendant then sued the joint tort-feasor for contribution, and received it. There this Court did not have to consider the effect of a settlement which ended the settling defendant's direct liability to the non-settling joint tort-feasor. The effect such settlements should have is not an arid and technical question. It is one rooted in important and conflicting principles of public policy. Three principles must be considered in choosing the rule.
 
 
 34
 First, the law generally seeks to assure the tort victim neither more nor less than one complete satisfaction of his claim.[6] A rule of pro tanto reduction accomplishes this goal. A rule of pro rata reduction frustrates it to the extent that the plaintiff makes a good or a bad settlement.
 
 
 35
 Second, the law seeks to encourage settlements. A rule that the settling defendant will remain liable to contribute after an award against a non-settling defendant would impede settlements. So would a rule that the plaintiff must give non-settling defendants the benefit of a pro rata reduction in their liability. The 1939 Uniform Contribution Among Tort-feasors Act emphasized competing policies rather than the policy of promoting settlements. Section 4 of the 1939 Act required a pro tanto credit for the amount of settlements the plaintiff received. However, Section 5 declared that settling defendants remained liable to contribute to non-settling defendants unless the release provided for a pro rata reduction of the plaintiff's damages recoverable against all the other tort-feasors. The 1955 Uniform Contribution Among Tort-feasors Act abandoned that policy choice. The 1955 Act retains the direct pro tanto credit rule. But section 4(b) now provides:
 
 
 36
 When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death; (b) It discharges the tort-feasor to whom it is given from all liability for contribution to any other tort-feasor.
 
 
 37
 See, 73 A.L.R.2d 403 (1960).
 
 
 38
 Third, considerations of justice suggest that tort-feasors whose conduct has caused a plaintiff a single injury should be equally liable (or, in comparative fault jurisdictions, should be liable in proportion to the degree of their fault) for the injury. A rule of pro rata reduction achieves the goal of equality albeit at the expense of other values. The same could be said of the rule of the 1939 Act which held a settling defendant liable to contribute. A rule of pro tanto reduction, on the other hand, defeats a goal of equality.[7]
 
 
 39
 None of these competing principles is insignificant. The law must choose to promote some at the expense of others. The choice has varied in different jurisdictions, and some courts have chosen to avoid innovation while calling for a legislative solution to the problem of choice. The issues posed are clear. The work of the law requires an early and definite declaration of a rule for the guidance of attorneys and litigants. The question of contribution rules is fairly presented in this case, and should not be avoided or deferred. As Judge Higginbotham of this panel wrote in Glus,
 
 
 40
 There are countervailing arguments, and the policy choice is a difficult one. But the litigants before us have tendered the issue, and its closeness does not absolve us from the obligation to decide it. Nor does our action become an impermissible encroachment on the legislative branch, merely because of the difficulty of the issue presented. (Whichever rule we adopt,) we must make a choice.
 
 
 41
 Supra at 257. In making our choice, we accord the least weight to the third principle. We believe that parties generally will have sufficient incentive to negotiate settlements as vigorously as they can, and that in most cases the settlements achieved will not deviate unacceptably from the aimed for proportionality of payment. We further believe that in most cases favoritism will present no problem, and that skilled attorneys will be able to discover collusive settlements and avoid the feared harmful effects of the collusion.[8] We see no necessary conflict between the first two policies. The policy of allowing complete satisfaction is furthered by a rule of pro tanto credit. And the rule of pro tanto credit is plainly preferable to a rule of pro rata credit in encouraging settlements. We therefore hold that in federal civil rights cases, where one or more defendants have settled with a plaintiff, the damages recoverable by that plaintiff shall be reduced by the amount of the settlement received.[9] Since we see nothing inconsistent with this rule in the decision of the district court, its decision on this point will be affirmed.
 
 
 42
 One further issue concerning contribution requires discussion. The decision of the district court did not specify whether it was based on the New Jersey law of contribution or on federal law. New Jersey law generally allows non-settling defendants a pro rata credit for settlement. Theobald v. Angelos, 44 N.J. 228, 208 A.2d 129 (1965). However, the non-settling defendant has the burden of proving that the settling defendant was a proper source of contribution, i. e., that the settling defendant would have been liable to the plaintiff for causing the same injury which the non-settling defendant caused. If the non-settling defendant cannot prove this, he is entitled only to a pro tanto credit, id. In this case the decision of the district court does not hold that Mr. Ronay or Apartments and Homes would have been liable to the plaintiffs. In fact, it appears that they would not have been liable. Mr. Ronay, as agent for the non-settling defendants, entered into a lease with the Millers. When the non-settling defendants repudiated it, Mr. Ronay provided further assistance to the Millers. It does not appear that he discriminated against the Millers on the basis of race. Therefore even if New Jersey law applied on the issue of contribution, the decision of the district court would be affirmed.[10]
 
 B.
 
 43
 Additionally, this appeal calls upon the Court to consider whether the limit on the award of punitive damages contained in 42 U.S.C. § 3612(c) creates an absolute ceiling on punitive damages when concurrent liability is established under the Fair Housing Act and section 1982. Although this issue is one of first impression in this Court, decisions elsewhere have held that no ceiling exists, Dillon v. AFBIC Development Corporation, 597 F.2d 556 (5th Cir. 1979) and Fountila v. Carter, 578 F.2d 487 (9th Cir. 1978).
 
 
 44
 Section 1982 and the Fair Housing Act stand independently of each other. Sullivan v. Little Hunting Park, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 286 (1969) and Jones v. Alfred Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).[11] While both statutes prohibit racial discrimination in real estate transactions, the language of each statute suggests that some forms of discrimination are not prohibited by both of these provisions, the Fair Housing Act does not prohibit racial discrimination in transactions having no nexus to realty, and section 1982 does not prohibit discrimination based on sex, religion or national origin. Thus to accept the proposition urged by the defendants, that the award of punitive damages be governed by reference to section 3612(c) when there is concurrent liability under the Fair Housing Act and section 1982, would be to create an undesirable anomaly in the law; punitive damages for racial discrimination having some nexus to realty would be limited to $1000 while no such limit would preclude a greater award for similar conduct in a transaction involving only personalty.[12]
 
 
 45
 Because of the independence of the Fair Housing Act and section 1982 and because of our desire to avoid this unjustifiable result, we hold there is no ceiling on the award of punitive damages under these circumstances. The Court expresses no opinion as to the applicability of section 3612(c) when the discriminatory conduct is illegal solely under the Fair Housing Act as that problem is not presently before us. However, it is noted that the Fair Housing Act and section 1982 are not completely overlapping and may both remain viable depending upon the facts involved.
 
 C.
 
 46
 Having decided that section 3612(c) does not limit the award of punitive damages in this case, we turn to the defendant's contention that the district court had no basis to assess $25,000 in punitive damages against Mr. Nuckel and CIB, jointly. Federal courts award punitive damages when a defendant has acted "with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so," Cochetti v. Desmond, 572 F.2d 102, 106 (3d Cir. 1978), or "with such conscious and deliberate disregard of the consequences of his actions to others that his conduct is wanton." Knippen v. Ford Motor Co., 546 F.2d 993, 1002 (D.C.Cir.1976) (quoted in Fountila v. Carter, 571 F.2d 487, 491 (9th Cir. 1978). We hold an employer liable for punitive damages for the conduct of his agent when the record shows that he was, "by action or knowledgeable inaction, involved in the wrongdoing," Marr v. Rife, 503 F.2d 735, 745 (6th Cir. 1974), or that he has "authorized, ratified, or fostered the acts complained of." Williams v. City of New York, 508 F.2d 356, 361 (2d Cir. 1974). The district court correctly applied those standards in this case. App. at 130-31. Considering that Mr. Nuckel and CIB had previously entered into a consent decree agreeing to pursue a policy of non-discrimination, and that Mr. Nuckel blithely admitted, via deposition, that he had not taken any action either to implement or enforce a policy of non-discrimination, but rather his only interest was to make money and further considering that guesswork alone was used to fulfill requirements to report the number of minority tenants, this Court is satisfied that the district court's assessment of $25,000 punitive damages against entities receiving between $300,000 and $400,000 per month in gross rentals was not an abuse of discretion.
 
 D.
 
 47
 The defendants challenge a portion of the compensatory damage award, specifically, the $4451.00 awarded as the difference in rent and utility bills between the substitute apartment and apartment sixty-seven. It is suggested that this award was improper because the Millers received fair economic value in exchange for their rent and utility payments and therefore suffered no legal damage. Defendants further contend that if the plaintiffs did suffer legal damage, then the proper measure of damages should be, by analogy to the measure of damages when a seller breaches a contract to sell real property, the difference between the rent specified in the lease for apartment sixty-seven and the fair market value of that apartment. The defendants also urge that the trial court erred in not finding that the Millers failed to mitigate damages in remaining at a superior and expensive substitute apartment.
 
 
 48
 We reject the contention that the Millers suffered no legal damage; the substitute apartment was "all electric" while apartment sixty-seven was not. Therefore simply due to the economics of the utility market, the plaintiffs were forced to pay more at the substitute apartment for substantially the same value they would have received at apartment sixty-seven. We also note the substitute apartment complex had been described by Mr. Ronay as "too expensive" suggesting that it was overpriced and that its rent was in excess of its fair market value. Further, if and to the extent that the Millers did receive more value at the substitute apartment, this can be viewed as a forced reallocation of their monetary resources, i. e. because of defendants' actions plaintiffs were forced to pay more for an apartment than they wished and thus, had less money available to be used for other purposes.
 
 
 49
 Although defendants contend a real property measure of damages is proper, we conclude that the difference in rent and utility bills between the two apartments is the proper measure of damages in these circumstances. Upon consideration of the trend to treat leases within the framework of contract rather than property law, and the concept of "cover" in sales transactions, we find an appropriate remedy for defendants' racial discrimination is to allow appellees to "cover." See Young v. Parkland Village, Inc., 460 F.Supp. 67, 71 (D.Md.1978), Walker v. Fox, 395 F.Supp. 1303, 1306 n.2 (S.D.Ohio 1975), Stevens v. Dobs, Inc., 373 F.Supp. 618, 623 (E.D.N.C.1974), for decisions awarding compensatory damages measured by difference in rent and/or utility bills without discussion.
 
 
 50
 Whether plaintiffs failed to mitigate damages depends upon the reasonableness of their conduct; the finding of the trial court is one of fact reversible only for clear error. Williams v. Albemarle City Bd. of Education, 508 F.2d 1242 (4th Cir. 1974). Considering all of the facts and circumstances of this case, the district court's finding of reasonableness is not clearly erroneous and must be sustained.
 
 E.
 
 51
 There is also a challenge to the award of attorneys' fees. Plaintiffs have been represented by public interest attorneys in these proceedings and are not obligated to pay for legal services.[13] The district court awarded $21,845.00 as attorneys' fees under the Civil Rights Attorney's Fees Award Act of 1976. This award is opposed on four bases.
 
 
 52
 The principles controlling the award of attorneys' fees are well-established in this Circuit. We will therefore briefly address defendants' four arguments. Defendants first contend since the Millers are not obligated to pay their public interest attorneys, the award is a windfall. That argument was previously rejected in Rodriguez v. Taylor, 569 F.2d 1231 (3rd Cir. 1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978), which established that attorney's fees may be awarded litigants represented by public interest attorneys. Rodriguez mandates that such award must accrue to counsel to avoid a windfall to litigants. The Court feels secure that the district court's award of attorneys' fees contemplated payment to the attorneys.
 
 
 53
 Defendants also suggest that the district court did not, but should have, considered plaintiffs' ability to pay attorneys' fees, particularly in light of the substantial punitive damages awarded. In Hughes v. Repko, 578 F.2d 483 (3rd Cir. 1978) we expressly left open the question of whether a court may take into account ability to pay attorneys' fees, and left this issue for determination in the first instance by the district court on remand. In the matter sub judice the district court did in fact consider the Millers' ability to pay and found that they could not afford private counsel to engage in this type of litigation. The district court performed the analysis suggested by the defendants; the plaintiffs do not assert that this was error. Given this posture, we perceive no need to resolve the question left open in Hughes. Additionally, the proper relationship between an award of attorneys' fees and punitive damages was addressed in Aumiller v. University of Delaware, 455 F.Supp. 676 (D.Del.1978), aff'd, 594 F.2d 854 (3rd Cir. 1979), which held that the award of attorneys' fees should not be reduced by sums awarded as punitive damages.
 
 
 54
 Moreover defendants urge that the amount awarded as attorneys' fees must be reduced to the actual costs incurred by the public interest organization. Rodriguez, supra, held that the award of attorneys' fees to public interest attorneys should be made on the basis of reasonable hourly rates based on experience and expertise of the attorneys and that the award should not be limited to the actual salaries paid public interest attorneys. We are in accord with that holding.
 
 
 55
 Finally, the defendants contend that the amount awarded as attorneys' fees should be adjusted downward because of the limited effects and limited benefits of this litigation.[14] Hughes v. Repko, supra at 492, (Garth, J., concurring) suggests factors which may be considered in adjusting the lodestar amount (reasonable number of hours times reasonable hourly rate). An assessment of these factors leads to the conclusion that the lodestar amount need not be reduced. For all of the foregoing reasons, the district court did not abuse its discretion in the award of attorneys' fees.
 
 
 56
 The judgment of the district court will be affirmed.
 
 
 
 *
 Honorable Hubert I. Teitelbaum, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Despite the statements made to the Millers that the apartment had been rented previously, on September 12, 1973, a white tester was shown three apartments in the Florence Apartments complex, including apartment sixty-seven, and was informed that all were available
 
 
 [2]
 This matter was originally filed as a class action, however the motion for certification was denied. No appeal has been taken from that decision
 
 
 [3]
 The remainder of the compensatory damages were for moving expenses, car rental expenses, and telephone expenses totalling $801.00. Mr. Miller was awarded $3,500 for pain and suffering and deprivation of rights and Mrs. Miller was entitled to $2,500 to include her loss of consortium. The propriety of these awards is not disputed
 
 
 [4]
 The appellants say the court should have followed the "enlightened" New Jersey rule on this issue, though they do not specify whether that rule should have been applied because of the site of the controversy or because that rule should become the uniform federal rule
 
 
 [5]
 This case deals only with the effect of a settlement by one defendant in a tort case upon the liability of non-settling defendants. It does not deal directly with problems of contribution among joint tort-feasors. However, the two problems are so intertwined that they cannot sensibly be treated in isolation. At some points in this decision the rules governing these problems will be referred to as "contribution rules" for simplicity
 
 
 [6]
 This principle is generally stated in this form, without regard to the necessary limitations found in rules which require the victim to bear most of his litigation costs and which allow him to keep receipts from "collateral sources" without a corresponding reduction in the defendants' liability
 
 
 [7]
 An argument has been made that a rule of pro tanto reduction is unjust for an additional reason. The pro tanto rule, the argument goes, encourages favoritism and collusion. A plaintiff may settle his claim against one defendant for a small payment with the understanding that the settling defendant will then help the plaintiff to present a strong case against the remaining defendants
 
 
 [8]
 We note, without purporting to decide an issue not present in this case, that section 4 of the 1955 Uniform Act discharges settling tort-feasors when a release is given "in good faith."
 
 
 [9]
 The parties have assumed in this case that the settlement by Ronay and Apartments and Homes discharges them from claims of contribution. We believe that this assumption, which reflects the rule of the 1955 Uniform Act, is correct as a matter of federal law
 
 
 [10]
 We noted that the same issue of burden of proof may arise under the federal rule in actions for contribution from non-defendants, such as the action in Glus. New Jersey is not alone in requiring that a party seeking contribution bear the burden of proof that his opponent would have been directly liable. Johnson v. Rogers, supra at 304 (Minn.); the Uniform Act of 1955, § 1(a); Prosser, § 50 at 309
 
 
 [11]
 See also, Bishop v. Pecsok, 431 F.Supp. 34 (N.D.Ohio 1976); Parker v. Shonfeid, 409 F.Supp. 876 (N.D.Cal.1976); Clemons v. Runck, 402 F.Supp. 863 (S.D.Ohio 1975); Allen v. Gifford, 368 F.Supp. 317 (E.D.Va.1973); Wright v. Kaine Realty, 352 F.Supp. 222 (N.D.Ill.1972)
 
 
 [12]
 Such a construction would limit the award of punitive damages to $1000 for a racially motivated refusal to sell a farm while no limit on the award of punitive damages would exist for racially motivated refusal to sell a tractor for use on the farm, both of which are prohibited by section 1982
 
 
 [13]
 Appellees do have a retainer agreement with original counsel for limited services performed
 
 
 [14]
 The district court calculated the lodestar and made no adjustment for contingency or quality factors; that portion of the judgment was not appealed from