United States Court of Appeals,

Fifth Circuit.

No. 93-4967.

Bobby HARRIS, et al., Plaintiffs-Appellees,

v.

ANGELINA COUNTY, TEXAS and Angelina County Sheriff Mike Lawrence,
Defendants-Third Party Plaintiffs-Appellants, Cross-Appellees,

The TEXAS DEPARTMENT OF CRIMINAL JUSTICE, et al., Third Party
Defendants-Appellees, Cross-Appellants.

Sept. 13, 1994.

Appeals from the United States District Court for the Eastern
District of Texas.

Before REAVLEY, GARWOOD and EMILIO M. GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

In this prisoner class action suit, the district court found
unconstitutional conditions at the Angelina County jail, and
granted injunctive relief in the form of a population cap on the
number of inmates.  We find no error in the district court's
findings of fact and conclusions of law in support of the
injunctive relief granted.  We also conclude that the district
court did not err in dismissing a third-party claim against state
prison officials.

BACKGROUND

Plaintiffs Bobby Harris and Terry Weekly, former prisoners at
the Angelina County Jail, brought this 42 U.S.C. § 1983 suit
seeking relief from allegedly unconstitutional conditions at the
jail.  The suit was brought against Angelina County and the county
sheriff in his official capacity.  These defendants (collectively

the County) brought a third-party action against the Texas Department of Criminal Justice (TDCJ), individual members of the Department, and individual members of the Board overseeing the Department (collectively the State defendants). All of the individual third-party defendants were sued in their official capacities. After a bench trial the district court dismissed the State defendants and issued an injunction capping the jail population at 111.

DISCUSSION

A. *The Injunction*

We review the district court's findings of fact for clear error and its legal conclusions *de novo.*[1] *Fiberlok, Inc. v. LMS Enterprises, Inc.,* 976 F.2d 958, 962 (5th Cir.1992). Deciding whether jail conditions are unconstitutional involves mixed questions of law and fact. The district court employed a correct legal analysis of the issues before it.

The jail houses pretrial detainees and convicted felons. Pretrial detainees are protected by the due process clause of the Fourteenth Amendment. *See Valencia v. Wiggins,* 981 F.2d 1440, 1445 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993). Conditions of detention constitute

---

[1]The injunction was interlocutory in the sense that it was entered not as part of a final judgment and "pending further order of the Court." However, it represented the court's final disposition of the claims concerning jail conditions as they existed up to the time of trial, and was not a preliminary injunction under FED.R.CIV.P. 65(a) contemplating a later disposition after trial. Accordingly, the district court and appellate standards appropriate to the granting or denying of a preliminary injunction are inapplicable here.

2

deprivations of liberty without due process if they amount to punishment of the detainee. *Id.* Of course, confinement of a pretrial detainee necessarily involves some loss of liberty. Deciding whether a condition of confinement amounts to "punishment" under a due process analysis turns on whether "the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell v. Wolfish,* 441 U.S. 520, 538, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979). Without delving further into the subtleties of this doctrine, we think it sufficient to note that jail conditions which amount to "cruel and unusual punishment" under the Eighth Amendment surely amount to "punishment" under the Fourteenth Amendment. Evidence presented to the district court indicated that pretrial detainees were treated the same as convicted felons. For example, all inmates are segregated on the basis of prior criminal history; pretrial detainees with criminal records are placed in the general population with other previously convicted felons.

As to convicted felons, a violation of the Eighth Amendment's prohibition against cruel and unusual punishment occurs if two requirements—one objective and one subjective—are met. *Farmer v. Brennan,* --- U.S. ----, ----, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). Under the objective requirement, the deprivation must be so serious as to "deprive prisoners of the minimal civilized measure of life's necessities," as when it denies the prisoner some basic human need. *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991). Under the subjective

3

requirement, the court looks to the state of mind of the defendant; deliberate indifference on the part of prison officials will suffice to meet this requirement. *Id.*

The district court found that constitutional violations had occurred due to overcrowding, and that housing more that 111 inmates in the current facility violates the Eighth Amendment rights of the convicted inmates and the Fourteenth Amendment rights of the pretrial detainees. It considered the objective and subjective elements of Eighth Amendment analysis. The County and the State defendants argue that the court erred in finding unconstitutional conditions. We cannot say that the district court, having employed the correct rules of law to this case, clearly erred in finding unconstitutional conditions as a result of overcrowding. Viewing the record as a whole, we are not "left with a definite and firm conviction that a mistake has been committed." *Graham v. Milky Way Barge, Inc.,* 824 F.2d 376, 388 (5th Cir.1987).

As to the objective element of Eighth Amendment analysis, evidence supports the district court's conclusion that, given the jail's current management, staffing, and physical plant, a population exceeding 111 leads to a denial of the inmates' basic human needs. The design capacity of the current jail is 111, meaning that the current facility has 111 bunks. The district court correctly noted that design capacity is not always equivalent to constitutional capacity, but that design capacity is relevant to the constitutional inquiry. *Compare Alberti v. Sheriff of Harris County,* 937 F.2d 984, 1000-01 (5th Cir.1991) (holding district

4

court's finding of unconstitutional jail overcrowding not clearly erroneous, where district court considered design capacity in conjunction with the "totality of the conditions."), *cert. denied*, --- U.S. ----, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992). Prior to the district court's ruling, The Texas Commission on Jail Standards, which periodically reviews conditions at the jails around the state, issued a remedial order limiting the jail population to 111. Again, we agree with the district court that this order, while not dispositive, is instructive.

Additional evidence supports the district court's finding that overcrowding had resulted in a denial of basic human needs of the jail population. The court noted that in the recent months prior to its ruling the jail had an average daily count of 135 inmates. The population has gone as high at 159 inmates. Plaintiffs' expert, who was well qualified, testified that with proper staffing the facility could properly accommodate 111 inmates, and that to ensure proper classification, the population should probably not exceed 105 inmates. Evidence was presented that staffing, supervision, management and classification of prisoners are all important to maintaining basic human needs in the jail, and that all are affected adversely by overcrowding. The design of the facility is such that when the jail population exceeds 111 some prisoners must sleep on the floors in "day rooms" which are not designed as sleeping quarters. *Compare Alberti,* 937 F.2d at 1000-01 (concluding that district court did not clearly err in finding unconstitutional jail conditions where court considered, *inter*

5

*alia,* design capacity, the physical design of the cellblocks, and "the fact that thousands of inmates were sleeping on the floors"). Even the State defendants' expert conceded: "[I]f you go significantly above that [111] number without any improvement in the operation of the jail, you are going to hit that constitutional wall fairly quickly, in my opinion."[2]

Jail officials and former and present prisoners testified to numerous specific incidents that the district court could have found were the result of, or at least were exacerbated by, the overcrowding at the jail. These incidents included abuse and intimidation by stronger or more hardened inmates of weaker inmates, inadequate care for inmates with special needs, improper sexual relations between inmates or between inmates and guards, the operation of a homemade still, illegal drug use, and fighting among inmates. Evidence indicated that the reported incidents represented only the "tip of the iceberg" of the total incidents. The evidence also showed that, unlike state penitentiary facilities, the jail houses a highly heterogenous mix of inmates: men and women, inmates still under the influence of drugs or

---

[2]The same expert earlier responded to an inquiry from the court as follows:

> THE COURT: Let's assume that Angelina County is not willing to add five security additional employees, intake person, a classification person, doctor full or part-time or contract or however, Angelina County is not willing to put twelve new bunks in each dorm and double cell for the four and the six, and is—prefers to leave staffing levels and the facilities as they are. Now, assuming that is true, I gather then you are hard-pressed to disagree with the 111?

> THE WITNESS: You gather correctly.

6

alcohol after arrest, inmates with prior convictions for serious felonies and those with no criminal records and under arrest for minor offenses, etc. In such a jail the proper segregation and classification of inmates is of paramount importance. Evidence was presented that the physical layout and size of the facility was such that overcrowding in excess of design capacity would adversely affect the ability of jail officials to safely and properly segregate inmates. Evidence that overcrowding had an impact on security, recreation and the delivery of medical care was presented as well.

We also conclude that the district court did not clearly err in finding that the subjective element of Eighth Amendment analysis was established against the County. Reports from the Texas Commission on Jail Standards to the County, various incident reports, evidence brought to the attention of the County through this ongoing litigation itself, and testimony from the County's sheriff and jail administrators all support the conclusion that the County was well aware of the overcrowding at the jail and the resulting conditions. We also agree with the district court's analysis of this issue. It found that:

> the County Defendants make deliberate decisions whether or not to pick up prisoners, to release them or to detain them. County Defendants also make decisions concerning staffing levels, classification of inmates and configuration of the facility. The exercise of this decision making authority, which has resulted in inmates being housed in unconstitutionally overcrowded jail facilities, meets the criteria of deliberate indifference required by the Eighth Amendment.

The County argues that the subjective element was not met

because, in response to the overcrowding, "the county officials did everything in their power—from building a dormitory to transferring inmates to providing alternatives to incarceration—in order to relieve overcrowding."  It argues that the overcrowding is beyond its control because the state has refused to take paper-ready felons who belong in state prison facilities,[3] and that the County has "continuously spent over budget for the expenses of the jail and anticipated going over budget in 1992, even with declining revenue from sales taxes, fines and fees due to a slow economy."  Despite this evidence, we cannot say that the district court clearly erred in finding that the subjective element was met.  Evidence was presented that the County could, and in fact had, simply delayed acting on arrest warrants in response to overcrowding concerns, and had addressed overcrowding through other means as well, including the use of probation, other facilities and electronic monitoring.  While such approaches may not be ideal from a public policy standpoint, they demonstrate that alternatives were available to address the unconstitutional conditions at the jail.

As to a purported lack of funding, the Supreme Court has left open the question of whether a cost defense is available under Eighth Amendment analysis. *Wilson v. Seiter,* 501 U.S. 294, 301-03,

---

[3]"Paper-ready" or "state-ready" felons consist of convicted felons sentenced to the state prison system and awaiting transfer from county facilities.  Due to its own overcrowding problems, the state has engaged in a policy of deliberately leaving paper-ready felons in county facilities, and accepting transfers of such felons from county jails under an allocation formula. *See* TEX.GOV.CODE § 499.071 (West Supp.1994); *Alberti,* 937 F.2d at 987-89.

8

111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991). Prior to *Seiter,* this court rejected the defense. *See Alberti,* 937 F.2d at 999 and cases cited therein. Even if a cost defense were recognized, we would find it inapplicable here, since the evidence did not establish that additional funding was unavailable from the taxpayers to address the overcrowding. On the contrary, the sheriff testified:

> The budget hasn't been a problem: I overspend my budget every year, but the paper hasn't raised cane about it, the Commissioners haven't raised cane about it, the citizens haven't. They know the problem is something that we can't handle as far as—or can't control as far as the amount of people coming in. So.... they've always paid whatever we've run over, and—and we've pretty well accepted that, that we will.

While a population cap may be an appropriate remedy to relieve overcrowding,[4] the district court correctly recognized that a constitutional review of jail conditions should not consider inmate population in a vacuum. It stated in its order that it "will entertain any motion by the County Defendants to raise the population cap upon notification that the County has made changes in the configuration of the physical plant, increased staffing and upgraded its classification system such that an inmate population in excess of 111 can be housed in the jail without violating the Constitutional rights of the Plaintiff Class." We agree with this approach and urge the district court to freely and fully revisit

---

[4]*Alberti v. Sheriff of Harris County,* 978 F.2d 893, 896 (5th Cir.1992) ("A numerical cap on the number of prisoners is not an overly intrusive remedy. It gives the county maximum flexibility in determining on its own how to meet the population goals."), *cert. denied,* --- U.S. ----, 113 S.Ct. 2996, 125 L.Ed.2d 690 (1993).

the need for the injunction should the County bring any relevant change in circumstances to its attention.[5]

B. *The Third-Party Claims Against the State Defendants*

The County complains that the district court erred in dismissing its third-party action against the State defendants. In its third-party complaint the County sought monetary and injunctive relief against the State defendants in the event the County was found liable to plaintiffs, as well as attorney's fees. Overcrowding at the jail results from the presence of both traditional county inmates and paper-ready felons awaiting transfer to state facilities.

The district court dismissed the State defendants with the following reasoning:

> The County Defendants, as Third-Party Plaintiffs did not establish that the State Defendants had a legal duty to pick up paper-ready felons within a certain length of time. Further, the State Defendants have reimbursed Angelina County for the expenses of housing paper ready felons in accordance with the statutory formula set out in [TEX.GOV'T CODE ANN. §§ 499.123-499.124 (Vernon Supp.1994) ].

While we cannot agree with this analysis, we nevertheless hold that the State defendants were properly dismissed.

The County alleged in its third-party complaint that the state's refusal to accept paper-ready felons was the cause of plaintiffs' damages, and sought to have the state enjoined to timely accept those felons. Whether the state is making payments

---

[5]We note that there in no apparent procedural barrier to reopening the case, since so far as we can tell from the record, the County is correct in contending that no final judgment has been entered in this case. Our appellate jurisdiction rests on 28 U.S.C. § 1292(a)(1).

10

to the County for housing state felons, under the state statutory scheme, cannot by itself resolve the question of the state's constitutional obligations under the Eighth Amendment. To hold otherwise would mean that a state could abdicate its constitutional responsibility to its own felons by paying a third party to house them.

We addressed the issue of state liability for unconstitutional conditions at a county jail in *Alberti.* We recognized that liability under § 1983 depends on which state actor is responsible for the civil rights violation, and that this question "turns *exclusively* on state law." *Alberti,* 937 F.2d at 994 (emphasis in original). We agreed with the district court that, under Texas law, both the state and county are responsible for the conditions at county jails, and both are therefore liable for constitutional violations at such jails. *Id.* at 996-97. In particular, we noted that by statute the state places primary responsibility for the confinement of felons on a state agency, the TDCJ. *Id.* In our case, the State defendants can point to no significant changes in state law that would alter the careful analysis and conclusion of the district court and this court in *Alberti.*[6] The state's current

---

[6]Under the current statutory scheme, the TDCJ remains the state agency "with primary responsibility for [ ] the confinement, supervision, and rehabilitation of felons...." TEX.GOV'T CODE § 493.001 (Vernon Supp.1994). The Board of the TDCJ is required to adopt and enforce an allocation formula for accepting inmates from county facilities. *Id.* § 499.071. The director of the TDCJ's institutional division must "adopt rules to provide for the safe transfer of inmates from the counties in which inmates are sentenced to the institutional division." *Id.* § 500.006(a). Further, a provision effective after the *Alberti* decision now provides:

statutory obligation to make payments to counties holding paper-ready felons does not divest the state of its constitutional responsibility for assuring that state felons—felons convicted in state courts of state crimes and sentenced to the state prison system—are not subjected to cruel and unusual punishment.

However, our case differs from *Alberti,* since the plaintiffs in that case brought direct claims against the state defendants to avoid the very problem we face here. *Alberti,* 937 F.2d at 988, 990. We note that if some of the claims the County asserted against the State defendants (including claims for contribution and other relief under state law) had been brought by a private citizen, they would have been properly dismissed under the Eleventh Amendment.[7] That Amendment however would not appear to bar all

> If a state or federal court determines that conditions in a county jail are unconstitutional, and if on or after October 1, 1991, the percentage of inmates in the jail awaiting transfer to the institutional division is 20 percent or more of the total number of inmates in the jail, the commission shall transfer inmates from the jail to an appropriate jail, detention center, work camp, or correctional facility, but only to the extent necessary to bring the county into compliance with court orders or to reduce the percentage of inmates in the jail awaiting transfer to the institutional division to less that 20 percent of the total number of inmates in the jail.

*Id.* § 499.125.

[7]Decades of Supreme Court jurisprudence have defined the contours of Eleventh Amendment immunity, and we do not attempt a comprehensive analysis here. Under the current state of the law, the TDCJ is deemed an instrumentality of the state operating as its alter ego in carrying out a public function of the state, and is immune from suit under the Eleventh Amendment. *Ruiz v. Estelle,* 679 F.2d 1115, 1136-37 & n. 75 (5th Cir.1982) (dismissing claims against board of Texas Department of Corrections (TDC), predecessor of TDCJ, since board was "merely

12

such claims.  Under the authority of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) and later authority, a § 1983 action seeking prospective injunctive relief based on federal constitutional violations may be brought against state officials in their official capacities.  *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2312 n. 10, 105 L.Ed.2d 45 (1989);  *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) ("official-capacity actions for prospective relief are not treated as actions against the State.").[8]

Our analysis leads us to two questions.  The first is whether contribution is generally available to a defendant sued for violation of a plaintiff's civil rights under § 1983.  The second

---

an agency of the state"), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983);  *Loya v. Texas Dep't of Corrections,* 878 F.2d 860, 861 (5th Cir.1989) (holding TDC immune from suit under Eleventh Amendment).  In contrast, counties generally are not immune from suit under the Eleventh Amendment.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 278-80, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).  State law claims against the State defendants, such as the claim for contribution under state law asserted in the third-party complaint, are also barred by the Eleventh Amendment.  *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102-03, 124-26, 104 S.Ct. 900, 909, 921, 79 L.Ed.2d 67 (1984).

[8]In appropriate circumstances, attorney's fees ancillary to the award of prospective injunctive relief may also be awarded, even where the fees are ultimately to be paid from state coffers. *Hutto v. Finney,* 437 U.S. 678, 687-98, 98 S.Ct. 2565, 2572-78, 57 L.Ed.2d 522 (1978);  *Maher v. Gagne,* 448 U.S. 122, 129-34, 100 S.Ct. 2570, 2575-77, 65 L.Ed.2d 653 (1980);  *Wyatt v. Cole,* 928 F.2d 718, 722 (5th Cir.1991) ("Congress intended to authorize awards of attorneys fees under § 1988 to prevailing parties in official-capacity actions even when the state is immune from damages under § 1983."), *rev'd on other grounds,* --- U.S. ----, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992).

is whether, assuming there is such a general right to contribution, a federal court has authority to grant relief in favor of a political subdivision of a state and against the state itself. We need not answer the first question here, although we note that other courts have struggled with it and have reached different conclusions.[9]

---

[9]*Miller v. Apartments and Homes of New Jersey, Inc.,* 646 F.2d 101 (3d Cir.1981), addressed contribution under § 1982, and held that damages recoverable by a plaintiff had to be reduced by the amount of settlements received from other defendants. *Id.* at 110. It states that there is "a fair uniformity in favor of allowing contribution among the few courts which have considered the general question of contribution under the civil rights acts." *Id.* at 106. *Miller* recognized that questions regarding the effect of settlements and questions of contribution are closely related. *Id.* at 105 n. 5 ("However, the two problems [settlement and contribution] are so intertwined that they cannot sensibly be treated in isolation."). In *Dobson v. Camden,* 705 F.2d 759 (5th Cir.1983), *on rehearing en banc,* 725 F.2d 1003 (5th Cir.1984), this court addressed what effect to give a settlement in a § 1983 action. We initially held that a nonsettling defendant is entitled to a credit for a settlement by a joint tortfeasor in proportion to the amount of damages caused by the joint tortfeasor. 705 F.2d at 760. We treated the issue as a contribution issue of sorts. *Id.* at 762 ("It is impractical to consider the effect of a settlement without also considering the problem of contribution and, indeed, the very nature of joint liability."). However, when the case went en banc, we affirmed the district court on grounds that injuries caused by the settling defendant and the other defendants were separate, and there could be no joint liability requiring application of a rule of contribution or credit. 725 F.2d at 1005-6. Our case is somewhat different from *Dobson* and *Miller,* which addressed the effect of a settlement rather that a direct right of action by one defendant against another tortfeasor. These cases do suggest, however, that there are at least some notions of contribution applied to § 1983.

*Miller* is of questionable precedential value because in 1981 the Supreme Court decided two important contribution cases. In *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), the Court held that there was no right to contribution under Title VII and the Equal Pay Act. In *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061,

14

Assuming there is a right to contribution generally under § 1983, no party argues that relief from unconstitutional jail conditions is impossible without enjoining the state. The district court plainly did not believe so either, since it found unconstitutional conditions and entered an injunction to relieve those conditions, but nevertheless dismissed the State defendants. The issue therefore boils down to whether a federal district court in such circumstances, exercising its power to remedy civil rights violations under a federal statute passed pursuant to the Fourteenth Amendment, can grant a county contribution against its state.

We have previously held that state subdivisions, such as counties and municipalities, cannot assert constitutional claims in federal court against their creator, the state itself, or other state political subdivisions. *E.g. Town of Ball v. Rapides Parish Police Jury,* 746 F.2d 1049, 1051 n. 1 (5th Cir.1984); *Appling County v. Municipal Elec. Authority of Georgia,* 621 F.2d 1301, 1307-08 (5th Cir.1980), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980); *City of Safety Harbor v. Birchfield,* 529

68 L.Ed.2d 500 (1981), the Court held that there is no contribution under the federal antitrust laws. Subsequent district court cases have looked to these Supreme Court cases in deciding whether there can be contribution under § 1983 or other civil rights statutes. Most find no right of contribution. *See, e.g., Gray v. City of Kansas City,* 603 F.Supp. 872, 875 (D.Kan.1985); *Wright v. Reynolds,* 703 F.Supp. 583, 592 (N.D.Tex.1988); *Banks v. City of Emeryville,* 109 F.R.D. 535, 539 (N.D.Cal.1985). *But see Hoffman v. McNamara,* 688 F.Supp. 830, 834 (D.Conn.1988) (allowing setoff for settlement in § 1983 action); *Fishman v. De Meo,* 604 F.Supp. 873, 877 (E.D.Pa.1985) (holding that contribution is available in § 1983 cases).

15

F.2d 1251, 1253-56 (5th Cir.1976). One rationale for these cases is that political subdivisions lack Fourteenth Amendment or other constitutional rights against the creating state.[10] These cases arguably are distinguishable because here the County is not necessarily claiming a constitutional right against the state; instead, it is seeking contribution from the state for the violation of plaintiffs' constitutional rights.

Nevertheless, we conclude that the County should not be able to seek relief against the State defendants. A fundamental limit on federal jurisdiction is implicated here. As a general rule states cannot be made parties to a federal court suit. "[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III: "That a State may not be sued without its consent is a fundamental rule of jurisprudence ... of which the [Eleventh] amendment is but an exemplification.' " *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98-99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984) (quoting *Ex Parte State of New York,* 256 U.S. 490, 497, 41 S.Ct. 588, 589,

---

[10]*See City of Trenton v. New Jersey,* 262 U.S. 182, 188, 43 S.Ct. 534, 537, 67 L.Ed. 937 (1923) ("In none of [our prior] cases was any power, right, or property of a city or other political subdivision held to be protected by the Contract Clause or the Fourteenth Amendment. This court has never held that these subdivisions may invoke such restraints upon the power of the state."); *Birchfield,* 529 F.2d at 1254 ("Ever since the Supreme Court's landmark decision in *Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), it has been apparent that public entities which are political subdivisions of states do not possess constitutional rights ... in the same sense as private corporations or individuals. Such entities are creatures of the state, and possess no rights, privileges or immunities independent of those expressly conferred upon them by the state.") (citation omitted).

16

65 L.Ed. 1057 (1921)). *Young* represents a necessary exception to this general rule which "has not been provided an expansive interpretation," *id.* 465 U.S. at 102, 104 S.Ct. at 909, and we are not inclined to extend it to cover the County's claim for contribution here. The Supreme Court has concluded "that in enacting § 1983, Congress did not intend to override well-established immunities or defenses under the common law." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 67, 109 S.Ct. 2304, 2310, 105 L.Ed.2d 45 (1989).

In construing the Eleventh Amendment, the Court has recognized that Congress has the power under the Fourteenth Amendment to abrogate Eleventh Amendment immunity for the states, but that congressional intent to negate such immunity must be unequivocally expressed. *Id.* at 64-66, 109 S.Ct. at 2309; *Pennhurst,* 465 U.S. at 98-100, 104 S.Ct. at 907. We are unable to find an unequivocal expression of congressional intent to subject states to claims for contribution from their own political subdivisions. In *Pennhurst,* the court recognized that in applying the *Young* doctrine, "the need to promote the supremacy of federal law must be accommodated to the constitutional immunity of the States." *Id.* 465 U.S. at 105, 104 S.Ct. at 910. In striking this balance, the Court found it "difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* at 106, 104 S.Ct. at 911. Employing like reasoning, we can think of few greater intrusions on state sovereignty than requiring a state to respond, in federal

17

court, to a claim for contribution brought by one of its own counties. *Cf. Kelley v. Metropolitan County Bd. of Educ. of Nashville and Davidson County,* 836 F.2d 986, 988 (6th Cir.1987) ("if a state cannot be sued by its own citizens, *a fortiori* it cannot be sued by its own political subdivisions, which are creatures of the state and exist only at the state's sufferance."), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988).

## CONCLUSION

The district court's order is AFFIRMED.

18